# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

IMPERIAL PREMIUM FINANCE, LLC,

     Plaintiff,

v.

SUN LIFE ASSURANCE COMPANY
OF CANADA,

                               **JURY TRIAL DEMANDED**

     Defendant.

_____/

## COMPLAINT

Plaintiff Imperial Premium Finance, LLC[1] ("Imperial Finance") sues Defendant Sun Life Assurance Company of Canada ("Sun Life" or "Defendant") as follows:

## I.  INTRODUCTION

1.     This action involves certain high-premium life insurance policies procured by seniors in Florida, California, and other states based on unequivocal promises by Sun Life that it will not contest the policies' validity after they have been in force for two years, and will pay the death benefit under each such policy in exchange for the timely payment of premiums, regardless of whether the policy is owned by the original policy owner or a transferee/assignee at the time of the insured's death.

2.     After collecting tens of millions of dollars in premiums from policy owners who relied, and continue to rely, on Sun Life's representations and promises (including the promises made in its policies), Sun Life implemented a fraudulent profits scheme to contest the validity of these policies (all of which are beyond the two-year statutory contestability period) and remove the liability associated with them from its balance sheet.

---

[1]     Imperial Finance is a subsidiary of Imperial Holdings, Inc., which in turn is the parent company of various other subsidiaries including Imperial Life Financing II, LLC, Imperial Life Settlements, LLC, Imperial PFC Financing, LLC, Imperial PFC Financing II, LLC, OLIPP, LLC, and PSC Financial, LLC (Imperial Holdings, Inc. and it subsidiaries are collectively referred to "Imperial"). All causes of action belonging to the Imperial entities against Sun Life have been assigned to Imperial Finance.

3. Among other things, Sun Life's scheme includes: (i) misrepresenting its intention to honor policies in order to collect millions of dollars in premiums; (ii) misrepresenting that it will not contest the policies for any reason other than non-payment of premiums once the statutory two-year contestability period has expired; (iii) failing to comply with policy provisions; and (iv) filing suit after the expiration of the contestability period to contest the validity of the policies.

4. To redress Sun Life's unethical, illegal, and fraudulent conduct, Imperial seeks a declaration that: (a) the policies at issue are valid and enforceable, (b) the policies had insurable interest at inception, and (c) the statutory and contractual contestability periods have expired, thereby precluding Sun Life from ever contesting the validity of the policies for any reason other than non-payment of premiums. Imperial also seeks (d) compensatory damages resulting from Sun Life's misconduct and (e) punitive damages to punish Sun Life and deter it and other life insurance companies from engaging in similar conduct against their policy owners.

## II. JURISDICTION AND VENUE

5. This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds $75,000 (exclusive of interest and costs) and is between a plaintiff who is a citizen of Florida and a defendant who is a citizen of the Commonwealth of Massachusetts.

6. Venue properly lies in this judicial district because a substantial part of the events and omissions giving rise to the claims asserted herein occurred within this District and because Defendant conducts business in this District. 28 U.S.C. § 1391.

## III. PARTIES

7. Plaintiff Imperial Finance is a Florida limited liability company with its principal offices in Boca Raton, Florida. Imperial Finance is the assignee of the causes of action being asserted herein.[2]

8. Defendant Sun Life is, among other things, in the business of providing life insurance in the United States, directly and/or through its affiliates, and is licensed to sell insurance in 49 states, including California. Sun Life is organized under the laws of Canada, with its principal place of business in Wellesley Hills, Massachusetts.

---

[2] None of the assignors are citizens of Canada or the Commonwealth of Massachusetts.

## IV.  FACTS

### A.  Permanent Life Insurance and Lapse-based Policies

9.      Life insurance is a multi-billion dollar business in the United States. At the core of this industry lies the life insurance contract, under which a life insurance company, in exchange for premiums, promises to pay a designated beneficiary a sum of money (the death benefit) upon the death of the insured person.

10.      The traditional form of life insurance is term life, which provides insurance coverage for a fixed period of time in exchange for fixed premiums. Over time, however, life insurance has been transformed into an investment tool that, in addition to providing a death benefit, is used by consumers for tax-deferred growth, to offset potential estate tax liability, or for financial gain, among other things.  In part, this transformation was in response to the recognition by the United States Supreme Court more than a century ago that a life insurance policy is an acceptable form of investment with "the ordinary characteristics of property." *Grigsby v. Russell*, 222 U.S. 149, 156 (1911).

11.      Indeed, life insurance companies, including Sun Life, recognize that an insured has an unconditional legal right to transfer or assign his or her policy, and notify insureds of this right after a policy has been issued.  *See, e.g.*, Exhibit A at 14; Exhibit B.

12.      To that aim, insurance companies have found it profitable to design and aggressively market new forms of life insurance that emphasize their investment features. In turn, relying on the insurance companies' representations, consumers purchase these products under the belief and understanding that they are protecting themselves against the risk of death while at the same time making an investment having "the ordinary characteristics of property."

13.      These new forms of insurance, also known as permanent life insurance, include whole life and universal life. Permanent life insurance offers both insurance coverage and a cash value component (the investment feature), and as its name suggests, it is designed to last the entire life of the insured. While premiums for whole life insurance are fixed, premiums for universal life policies are generally flexible. In both cases, however, premiums are generally significantly higher than those for term insurance to account for both the savings (cash) element and the permanent insurance coverage.

14.      Apart from having a cash value, a permanent life insurance policy may be sold or assigned to a third party, who then becomes the policyholder for all legal and contractual

purposes. *Grigsby*, 222 U.S. at 156 (holding that life insurance policies may be transferred, much like other property).  To be certain, many insurance companies (including Sun Life) include in their policies the following or similar language: "While the insured is alive, you may change the Owner and Beneficiary [of the policy at any time] by written notice."

15.     Generally, insurance companies establish the premiums they will charge based on their expectations of the insureds' longevity.  Importantly, however, some insurance companies (and certainly Sun Life) also price their permanent life insurance policies based on the expected lapse rate of their book of business, a fact they conceal from their customers—a lapse is the cancellation of insurance coverage due to the non-payment of premiums.  In effect, these insurance companies bet that a substantial number of their policyholders will let their policies lapse and thus will never receive the death benefit for which they paid premiums.[3]

16.     When a permanent life insurance policy lapses, an insurance company generally obtains a significant financial gain because it is able to keep substantially all of the premiums it received while eliminating its entire liability (the amount of the death benefit) for the lapsed policy.[4]

17.     As explained by an actuary at a May 1991 Society of Actuaries meeting:

> When I first learned of these practices, I made a presentation to my boss to explain what lapse-supported pricing was. At the end of my presentation my boss looked at me and said, "Well? What are the actuaries going to do about this?" . . . .
>
> And I had to tell him, "I'm not sure the actuaries are going to do anything about it because frankly, the people who are coming up with these schemes are probably getting big raises and nice promotions, and they don't have much incentive to scale back." If sales are made based on the assumption that only 10% will be long-term persisters, the inevitable result is that 90% will be disappointed because they had intended to be part of the 10%.
>
> A car salesman could not advertise a picture of a Lamborghini, and put it in a box, and then have customers come in and pay for the

---

[3]     For this reason, some insurance carriers attempt to induce lapses of their policies by illegally interfering with transfers to institutional ownership in order to avoid their obligations under the policies.

[4]     Notably, over 50% of Sun Life policies for which Imperial provided premium financing have lapsed.

Lamborghini, only to realize later that only one out of ten buyers really got a Lamborghini, the other nine getting an old Nash or Volkswagen. They would have to disclose that it's a lottery, and that if you are unlucky, you get the Nash. You have to be lucky and a survivor to get the Lamborghini."

And, if they are placed in the position to give you a Lamborghini, they will do what it takes to avoid having to deliver the vehicle.[5]

### B.  Insurable Interest and Issuance of Policies

18.     A life insurance policy must have an insurable interest at the time of its issuance, but an insurable interest need not exist thereafter. *See, e.g.,* Fla. Stat § 627.404(1) ("The insurable interest need not exist after the inception date of coverage under the contract"); Cal. Ins. Code § 286 ("an interest in the life or health of a person insured must exist when the insurance takes effect, but need not exist thereafter").

19.     Once an insurance policy (with insurable interest at inception) is procured, the policy is valid and fully assignable—it can be sold, transferred, or serve as collateral for a loan. In fact, the United States Supreme Court has held that a policy with insurable interest at inception is like any other property in the hands of its owner.  *See Grigsby*, 222 U.S. at 156.  No carrier can prevent the owner from selling or borrowing against it.

20.     Insurable interest within the context of life insurance is generally defined as an interest based on the reasonable expectation of pecuniary advantage through the continued life, health, or safety of another person. *See, e.g.,* Cal. Ins. Code § 10110.1(a); Fla. Stat. § 627.404(2)(b).

21.     The law in most jurisdictions, including Florida and California, generally identifies the situations in which insurable interest exists. For instance, the law stipulates that an insured has an unlimited insurable interest in his or her own life and can have a policy made payable to whomever the insured pleases, regardless of whether the designated beneficiary has an insurable interest in the life of the insured. *See, e.g.,* Cal. Ins. Code § 10110.1 (b); Fla. Stat. § 627.404(2)(b)(1).

22.     A person who is closely related by blood or by law to an insured, such as his or her spouse or child, also has an insurable interest in the life of that insured. *See, e.g.,* Fla. Stat. §

---

[5]       *Available at* http://www.insuranceobserver.com/PDF/2005/021505.pdf.

627.404(2)(b); Cal. Ins. Code § 10110.1(a).  And a life insurance trust created by an insured has an insurable interest in the life of that insured if the death benefit is ultimately payable to the benefit of someone with an insurable interest, such as the insured's spouse or child. *See, e.g.,* Fla. Stat. § 627.404(2)(b)(5); *Lincoln Nat'l Life Ins. Co.* v. *Gordon R.A. Fishman Irrevocable Life Trust,* 638 F. Supp. 2d 1170, 1179 (C.D. Cal. 2009).[6]

23.     Before a policy is issued, the insurance company generally conducts an underwriting to assess the expectation of the life span of the prospective insured and the existence of insurable interest at the inception of the policy.  Underwriting procedures vary from company to company, but an insurance company will typically consider and verify the accuracy of information on a lengthy application completed by the prospective policyholder, insured, and carrier-appointed sales agent or broker. The insured is actively involved in this process and is usually required to provide medical records and undergo a medical examination.

24.     In addition to the information contained in the application, the insurance company may obtain other relevant information.  For example, where a life insurance trust applies to become the owner and beneficiary of a policy, the insurance company may ask for a copy of the trust instrument.  Because the trust instrument reflects the identity of the beneficiary or beneficiaries of the trust, it reveals the ultimate beneficiary of the death benefit for purposes of determining the existence of insurable interest.

25.     The insurance company has many tools that are readily available and routinely used in the industry during the underwriting process.  In the case of high-value policies, for instance, insurance companies may require information on the insured's net worth and income, such as copies of tax returns.  Many times, insurance companies also conduct, by themselves or through third parties, investigations and interviews of the insured and his or her accountants or agents.

26.     After it concludes it's underwriting, the insurance company decides whether to issue a policy, which is a contract that contains representations and promises made by the company to the policy owner.  If a policy is issued, the policy owner is responsible for making timely premium payments, when billed by the company, to keep the policy in force.  The owner

---

[6]     Many insureds choose to have the policy owned by and payable to a life insurance trust because this provides, among other things, tax benefits for purposes of estate planning.

can pay the premiums from, among other things, its own funds or other sources, such as a gift or a loan collateralized by the policy.

27.     In exchange for the timely payment of premiums, upon an insured's death, the insurance company promises to pay the death benefit to the designated policy beneficiary. Where the beneficiary of a policy is a life insurance trust, the death benefit is in turn payable by the trust to the trust beneficiaries, who are thus the ultimate beneficiaries.

**C.  Incontestability Statutes and Policy Clauses**

28.     Most states, including Florida and California, have a statutory requirement that every life insurance policy must include a provision, known as an incontestability clause, which states that the insurance company cannot contest the policy for any reason, except non-payment of premiums, after two years from the date of issuance.[7]

29.     Incontestability clauses were first introduced in the mid-nineteenth century <u>after years of insurer abuse and were designed to protect consumers from the "greed and ruthlessness of insurers</u>." 7 *Williston on Contracts* § 912, at 394 (1963)(emphasis added). State legislatures began to require these clauses to prevent continuing abuse by the insurance companies and to protect the consumer. Katherine Cooper, *Liar's Poker: The Effect of Incontestability Clauses After Paul Revere Life Insurance Co. v. Haas,* 1 Conn. Ins. L.J. 225, 228 (1995).

30.      An incontestability clause is akin to a statute of repose and is intended "to encourage insurance buyers to purchase insurance with confidence that after the contestability period has passed they are assured of receiving benefits' . . . as well as to reduce litigation." *New England Mutual Life Ins. Co. v. Doe,* 93 N.E.2d 1060, 1062 (N.Y. 1999) (citations omitted). In the words of Justice Oliver Wendell Holmes, "[t]he object of the [incontestability] clause is plain and laudable—to create an absolute assurance of the benefit, as free as may be from any dispute of fact except the fact of death, and as soon as it reasonably can be done." *Nw. Mut. Life Ins. Co. v Johnson,* 254 U.S. 96, 101-102 (1920).

31.     By the same token, the contestability period tells the insurer it has a specified period of time to investigate the representations made in the application process; if the insurance

---

[7]       *See, e.g.,* Fla. Stat. § 627.455 (every policy "shall provide that the policy shall be incontestable after it has been in force during the lifetime of the insured for a period of 2 years from its date of issue except for nonpayment of premiums"); Cal. Ins. Code § 10113.5 (every insurance policy "shall contain a provision that it is incontestable after it has been in force, during the lifetime of the insured, for a period of not more than two years after its date of issue").

company fails to conduct such an investigation during that period, it does so at its peril. *Amex Life Assur. Co. v. Superior Court*, 930 P.2d 1264 (Cal. 1997). "To hold otherwise might lead to no end of mischief as insurance companies who have taken no steps to verify the [insured's representations during the contestability period] then comb their files after the []contestability period expires, looking for some basis," any basis, to contest the policy and avoid payment of the death benefit they contracted to provide. *Id.* at 1271.

### D. Imperial's Premium Finance Program

32.      Premium financing is the lending of funds for the payment of premiums required to keep the insurance policy in force. A premium finance loan allows a policyholder to maintain coverage under the policy during the term of the loan without having to liquidate assets. Since at least the 1960s, premium financing has been a legitimate business that is expressly sanctioned and regulated in many states. *See, e.g.,* Fla. Stat. §§ 627.826-849 (first enacted in 1969); Cal. Fin. Code §§ 18560–18643 (first enacted in 1976).

33.      From its creation in November 2006 until 2011, Imperial provided loans for individual life insurance policies for payment of insurance premiums. Imperial was one of at least twenty lending institutions, including affiliates of Bank of America, Deutsche Bank, Goldman Sachs, and Credit Suisse, that have provided premium financing. Many of these companies offered programs similar to those offered by Imperial (i.e. non-recourse loans where the collateral for the premium finance loans was the policy itself).

34.      Insurance companies embraced the premium financing industry because it resulted in a dramatic rise in sales of policies and premium payments made to the companies. In fact, from the early 2000s until at least 2011, insurance companies (including Sun Life) sponsored events where life insurance agents were educated about the use of premium finance as a means to generate more business for these carriers.

35.      To comply with state law requirements on premium financing, Imperial obtained the necessary licenses from the applicable state regulators and made the necessary filings to maintain its licenses at all relevant times. Imperial was in good standing and held licenses from each of the following  states: Alabama, Louisiana, Maine, Michigan, Mississippi, Missouri, New Jersey, New Mexico, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, and Wisconsin.

36.     As authorized by law, each Imperial loan is secured by the applicable insurance policy as collateral, much like a bank secures its mortgage loans by having a collateral interest in real estate or secures a car or boat loan by a collateral interest in the car or boat.  Indeed, because an insurance policy is an asset of the policyholder, the policyholder is expressly permitted to borrow against it.

37.     As a prudent business practice and condition precedent to issuing a premium finance loan on a policy, Imperial required the following, among other things: (i) the borrower to be an irrevocable life insurance trust established by the insured that would be both the owner and beneficiary of the policy; (ii) the beneficiary of the life insurance trust to have an insurable interest in the life of the insured at the time of the issuance of the policy and during the entire term of the loan; and (iii) the appointment of a reputable professional co-trustee to ensure that the premiums were paid with the loan proceeds and that the trust abided by all applicable laws.

38.     Unless Imperial was able to confirm that an insurable interest existed at and since issuance of the policy, Imperial would not make a loan.  In fact, as indicated above, Imperial required the beneficiaries of each trust to have an insurable interest during the entire term of a loan, even though the law required an insurable interest only at the time the policy was issued.

39.     Thus, pursuant to the terms of loans issued by Imperial, if an insured passed away during the term of the loan, the trust beneficiary (who had an insurable interest in the life of the insured) would retain the full death benefit, less the monies owed to Imperial under the premium finance loan.

40.     If, at the end of the loan term (generally, two years) the insured had not passed away, the borrower (i.e. the irrevocable trust) had several options. One option was to repay the loan in full, as a result of which the policy was fully released of all liens and encumbrances relating to the loan. Another option was for the borrower to sell the policy in the secondary market and use a portion of the proceeds to satisfy its repayment obligations to Imperial. A third option was for the borrower to voluntarily default, as a result of which Imperial could foreclose on the policy as collateral and become the transferee/assignee to title over the policy or become the assignee of the beneficial interest in the trust that owned the policy.

41.     The decision as to which option was chosen at the end of the loan term was ultimately the borrower's, based solely on the best interest of the trust and the beneficiaries of the trust appointed by the insured (typically the spouse and/or children of the insured).

42.     Importantly, Imperial's business model (which was developed before the worldwide financial crisis that began in 2008) did not contemplate that Imperial would ultimately own a significant number of the policies that served as collateral for its loans.

43.     In fact, since December 2007, every credit facility from which Imperial borrowed monies to, in turn, fund its premium finance loans required Imperial to obtain what is known as lender protection insurance coverage ("LPIC"), which provided insurance coverage in the event of a premium finance borrower default.[8]  Specifically, upon a default, Imperial would make a claim against the LPIC policy and the LPIC provider would then pay the amount due under the claim to Imperial or Imperial's lenders, at which point the LPIC provider (not Imperial) had the sole right to own or direct ownership of the life insurance policy that served as collateral.[9]

44.     Thus, Imperial's business model was not designed for Imperial to take ownership of a policy upon a borrower's premium finance loan default.

45.     The severe and extended economic downturn that began in December of 2007 (commonly referred to as "the Great Recession"), however, gave rise to an unexpected and dramatic increase in defaults.

46.     As a result of the Great Recession, many borrowers could not repay their premium finance loans, resulting in Imperial having to foreclose on an unexpectedly high number of policies, much like banks were forced to foreclose on a large number of mortgages as a result of homeowners' inability to meet their debt obligations.

47.     The severity of the Great Recession was such that AIG, one of Imperial's LPIC providers, required a historic $186 billion bailout from the federal government.

48.     Consequently, upon a loan default, the LPIC providers frequently chose not to take or direct ownership of the policies, thereby allowing Imperial to become the sole transferee/assignee of the policies or of the trusts' beneficial interest.  In these instances,

---

[8]     Imperial obtained LPIC from "A"-rated insurance companies.  For example, it obtained LPIC from subsidiaries of American International Group, Inc. ("AIG") and from National Fire & Marine Insurance Company, an affiliate of Berkshire Hathaway Insurance Group.

[9]     Imperial incurred significant costs to obtain the LPIC and to borrow funds from its own lenders under credit facilities. For example, the cost for an LPIC ranged from 8.5% to 11% per annum of the principal balance of the premium finance loan.  Consequently, the fees and interest that Imperial charged on the premium finance loans reflected these costs.  Nevertheless, the interest Imperial charged on its loans was within the limitations imposed by law.

however, the LPIC providers maintained subrogation rights entitling them to substantial economic rights in the policies, and would often negotiate with Imperial a pay-off amount pursuant to which the LPIC provider would release all of their subrogation and economic rights.

49.     For instance, just a few months ago Imperial paid an LPIC provider $48.5 million to terminate the LPIC provider's subrogation rights in certain policies that had been foreclosed by Imperial and over which that LPIC provider had chosen not to exercise its rights to take or direct ownership.

**E.  Imperial's Premium Finance Loan Process**

50.     For years, Imperial had a policy that a potential borrower was required to have an in-force life insurance policy before it could apply for a loan from Imperial and that Imperial's employees were not permitted to be involved in the insurance application process.

51.     Moreover, as part of the loan approval process, Imperial would conduct its own due diligence process, even though it was not required to do so.  For example, Imperial verified that the medical history it obtained from the loan applicant had been provided to the insurance company.   It also verified the identities of the insured, policy owner, and beneficiaries; performed background checks; and ensured the agents were properly licensed.

52.     Imperial also required each insured, trustee (of the borrower trust), and insurance sales agent to make representations and warranties confirming and assuring Imperial in writing of, among other things, the following: (a) that the application for insurance was completed accurately and contained no material omissions or misstatements, (b) that there was no "present intention to surrender, sell, or settle, directly or indirectly, the Policy or any interest therein," and (c) that neither the insured nor his spouse had received any inducement (money, property or otherwise) to obtain the Policy.

53.     Significantly and without exception, prior to approving a premium finance loan, Imperial took steps (including obtaining an analysis by an attorney) <u>to confirm</u> that there was an insurable interest at the time each of policy was issued and that only beneficiaries with an insurable interest had the right to receive the death benefit during the entire term of the loan. <u>Thus, and as stated above, Imperial never made a premium finance loan, unless the policy complied with insurable interest requirements</u>.

54.     Upon Imperial's completion of its application, due diligence, and approval process, Imperial discussed and negotiated the terms and conditions of the premium finance loan

with the borrower, his or her agent and/or the borrower's attorneys. Only after the parties agreed on the terms and conditions of the loan, and the borrower, the insured, the trust beneficiaries and the sales agents signed Imperial's premium finance agreement and related documents did Imperial make the loan.

**F.  Imperial's Business Model and Loan Documents Were Vetted and Approved by Third Parties**

55.     Imperial was not the only party to approve its business model and loan documents.

56.     Indeed, in the ordinary course of business, several third parties would review, comment on, and provide guidance and opinions on Imperial's business model and loan documents.  For example, "A"-rated insurance companies (*i.e.,* the LPIC providers) had access to and reviewed the loan documentation, as well as other documents considered by Imperial in its due diligence process prior to approving a premium finance loan. Many such documents were also reviewed by reputable independent public accounting firms, national law firms, investment banks and other reputable financial organizations in the ordinary course of business and in connection with Imperial's initial public offering in 2011.

57.     In fact, many state regulatory agencies conducted audits of Imperial's premium finance loan program, and the Florida Department of Insurance has reviewed Imperial's premium finance loan documents.

**G.  Sun Life's Policies at Issue**

58.     As stated previously, this action involves certain life insurance policies issued by Sun Life (each, a "Policy," and collectively, the "Policies"), specifically:

| Policy Number | Insured | Issue Date |
|---|---|---|
| 020116779 | Jerry Baker | 04/12/2006 |
| 030018011 | Carole Berg | 06/02/2009 |
| 030026302 | Sandra Berner | 12/15/2009 |
| 030027864 | Sheila Bernstein | 01/19/2010 |
| 030019434 | Evelyn Blakeslee | 12/28/2009 |
| 030025891 | Polya Blithstein | 01/25/2010 |
| 030006941 | Terry DeGraw | 10/03/2008 |

| 030021781 | Dale Dickler | 12/04/2009 |
| 020127596 | Lucy Eckstein | 08/09/2006 |
| 030027598 | Carole Fox | 01/07/2010 |
| 030021304 | June Fuhrman | 08/19/2009 |
| 030030997 | Elizabeth Geller | 08/10/2010 |
| 030025817 | Robert Good | 12/08/2009 |
| 030018935 | Gary Granby | 12/29/2009 |
| 030026491 | Robert Hopkins | 11/17/2009 |
| 030027007 | Esta Klein | 01/28/2010 |
| 030020848 | Joan Korn | 10/30/2009 |
| 030028404 | Helene Miller | 01/29/2010 |
| 030027091 | Evelyn Mitchel | 12/28/2009 |
| 030027019 | Hannah Parnes | 12/08/2009 |
| 030008864 | Diane Pastore | 09/09/2008 |
| 030014043 | Stephen Rogers | 03/03/2009 |
| 030002852 | Irene Sachs | 01/22/2007 |
| 030028237 | Donna Solk | 01/19/2010 |
| 030027988 | Ronald Spohn | 12/31/2009 |
| 020144710 | Kalman Talansky | 07/25/2007 |
| 030023575 | George Victor | 12/04/2009 |
| 020158522 | Manfred Von Nordheim | 06/27/2008 |
| 030023427 | Martin Wasser | 10/08/2009 |

59.     The Policies are all universal life insurance policies (*i.e.,* permanent policies); and all of the Policies, except two (those insuring the lives of Stephen Rogers and Carole Berg) became subject to a premium finance loan from Imperial after the policies had been issued.

60.     The Policies are all high-premium, high-value policies that have a death benefit of between one and ten million dollars. Indeed, as of the filing of this Complaint, Sun Life has collected *tens of millions of dollars* in premiums on the Policies.

61.     The following five bullet points set forth some of the material terms/characteristic of the Policies:

- ***The Owners and the Beneficiaries of the Policies***

62.     Each Policy was issued to an irrevocable life insurance trust (each, a "Policy Trust Owner;" collectively, "Policy Trust Owners") as the original policyholder.  The grantor of each of these trusts was the individual insured, who personally participated in the procurement of his or her Policy and in the establishment of the trust.  Each Policy also designated the trust as the sole beneficiary of the policy benefits (the "Policy Beneficiary").

63.     In turn, the sole beneficiary or beneficiaries for each trust were persons who were closely related to the insureds (the "Trust Beneficiary" or "Trust Beneficiaries").[10]  Therefore, at the time the Policies were issued, the Policy Beneficiary was the Trust Beneficiary(ies), who were persons with insurable interest in the life of the insureds.

- ***The Policy Trust Owner's Sole and Absolute Power to Exercise Policy Rights***

64.     Each Policy grants certain rights to the Policy Trust Owner. For instance, in each Policy, Sun Life agreed, among other things, that the Policy Trust Owner has "the sole and absolute power to exercise all rights and privileges under [the] Policy without the consent of any other person [including Sun Life]."  *See, e.g.,* Exhibit A, at 16.

65.     One such right of the Policy Trust Owner is the right to "change the Owner and Beneficiary by written notice," which takes effect immediately upon Sun Life's "acknowledge[ment or] *receipt* of the notice." *Id.* (emphasis added).

- ***Sun Life's Promise to Send Grace Notices Before a Policy Lapses***

66.     Sun Life also agreed that, if a Policy was due to lapse by reason of insufficient value, it would allow a grace period of 61 days from the date of lapse for the payment of a premium to keep the Policy in force.  Under such Policy, Sun Life was obligated to mail a notice to the policyholder, at least 31 days before the end of the grace period, indicating the amount due to keep the Policy in force.  *Id.* at 21.

- ***Sun Life's Unconditional Promise Not to Contest a Policy's Validity Beyond The Two Year Contestability Period***

67.     In each Policy, Sun Life also agreed not to contest the Policy after the expiration of its contestability period for any reason other than the non-payment of premiums.  *See, e.g., id.*

---

[10]     In some cases, the beneficiary of the trust can in turn be a family trust with its beneficiaries being persons who are closely related to the insured.

at 14.  Thus, other than for non-payment of premiums, Sun Life represented in clear and absolute terms that under no circumstances will it contest a Policy after the expiration of the two year contestability period.

68.     The two-year contestability period has expired for all of the Policies and the premiums on each Policy have been paid to Sun Life.

- ***Sun Life's Promise to Pay the Death Benefit Upon the Death of the Insured***

69.     In the Policies, Sun Life promised to pay the death benefit to the beneficiaries of the Policies upon the death of the insured if premium payments are current.

### H. Imperial Provided Financing for All Except 2 of the Policies and Subsequently Obtained the Right to Acquire All the Policies

70.     As noted, all except 2 of the Policy Trust Owners obtained a premium finance loan (each, a "Loan," and collectively, the "Loans") from Imperial to pay the premiums due to Sun Life under the terms of the Policies. [11]

71.     With respect to the Policies that were premium-financed by Imperial, each Loan was applied for by, and issued to, the Policy Trust Owner of each Policy after the Policy had been issued by Sun Life and was in force.

72.     For those Loans, the Policy Trust Owners decided, at the end of the loan term (generally, two years), to voluntarily default, causing Imperial to foreclose on the underlying Policies.

73.     Because the LPIC providers for those Loans decided not to exercise their rights to own or direct ownership of the Policies, Imperial became the sole transferee/assignee of the Policies (subject to the LPIC providers' subrogation rights).

74.     Consequently, pursuant to the terms of the Policies, Imperial or the Policy Trust Owners provided Sun Life with change of ownership and beneficiary forms to reflect Imperial's ownership of certain Policies.  While Sun Life acknowledged the change of ownership and beneficiary forms for some Policies, it refused to acknowledge them for others.  In the latter cases, the Policy Trust Owner remain the "owner" and "beneficiary" of the Policy on Sun Life's books.

---

[11]     The Policies insuring the lives of Stephen Rogers and Carole Berg were not premium-financed by Imperial.

75.     In all cases, however, Sun Life continued to bill for, demand and collect premiums for the Policies.

**I.   The NPA**

76.     On September 27, 2011, a search warrant was executed at Imperial's headquarters, and Imperial was informed that its premium finance business was being investigated by the U.S. Attorney's Office for the District of New Hampshire (the "USAO").

77.     On April 30, 2012, Imperial entered into a Non-Prosecution Agreement (the "NPA") with the USAO. Notably, the NPA did not relate to any of the Policies, as Sun Life is fully aware.[12] A copy of the NPA is attached as Exhibit C.

78.     In the NPA, the USAO agreed that the following facts—all of them material to the issue of insurable interest—are true and correct:

    a.     That Imperial required in all of its premium finance loans that (i) "the life insurance policy be held in an irrevocable life insurance trust," (ii) "a professional co-trustee be appointed" and (iii) "the co-trustee be responsible for ensuring that premium payments were made from the proceeds of the loan."

    b.     That "*[a]t all times during the loan, each policy was owned by an irrevocable life insurance trust for beneficiaries, who were required to be family members of the insured.*"

    c.     That, "*[a]t loan maturity, the borrower had several options: repay the loan and retain ownership of the policy; sell the policy in the secondary market and use the proceeds to pay off the loan; or default on the loan and relinquish ownership of the policy.*"

(emphasis added).

**J.   Sun Life's Fraudulent Profits Scheme**

79.     In order to induce the public to buy its policies and to thereby generate millions of dollars in premium payments, for years and until very recently, Sun Life purposely hid—from

---

[12]     The NPA differentiated among three formats of marketing used by Imperial: "retail seminar business," "retail non-seminar business," and "wholesale business." Exhibit C at ¶ 7. The statements made in ¶¶ 9-15 of the NPA relate only to the "retail non-seminar business", which, as Sun Life knows, is irrelevant to the Policies and to this case. *See id.* ¶¶ 9-15.

the public, the Policy Trust Owners, and Imperial—that it was Sun Life's intent not to comply with all of its duties and promises under the Policies.

80.     For example, as noted above, Sun Life promised to pay the death benefit upon the death of an insured if premiums are current.  However, Sun Life never intended to pay the death benefit in those instances where a Policy has been transferred to a third-party, including Imperial.

81.     Throughout the existence of the Policies, Sun Life also made representations to Policy Trust Owners and to Imperial that the Policies remain in force (entitling Sun Life to the collection of premiums), all the while hiding its intent not to honor its obligation to pay the death benefit upon the death of the insureds and further hiding its intent to contest the validity of each of the Policies.

82.     For instance, as recently as July 18, 2012, Sun Life was, among other things: (a) recording changes of ownership and beneficiary in favor of Imperial; (b) affirmatively representing to Policy Trust Owners and Imperial in policy statements and correspondence that their policies were in force and active; and (c) sending required grace notices for the Policies.

83.     At some point in July 2012, however, Sun Life began to openly execute its fraudulent profits scheme against the Policy Trust Owners and Imperial aimed at, among other things, (i) removing the death benefit liabilities associated with the Policies from Sun Life's balance sheet; (ii) booking as profits the tens of millions of dollars received in premium payments; and (iii) continuing to bill the Policy owners for premiums even though it does not intend to pay the death benefit on the Policies.[13]

84.     Sun Life's scheme also includes its aggressive attempts to improperly capitalize on the NPA, notwithstanding the indisputable presence of insurable interest at issuance in each of the Policies and Sun Life's knowledge that the Policies do not fall within the scope of paragraphs 9 through 15 of the NPA.  For instance, in 2012, Sun Life began sending letters to Imperial improperly referencing the NPA as a pretext to suggest, without any factual support,

---

[13]     Coincidentally, only a few months before, Sun Life publicly announced that it had decided to exit the individual life insurance business in the United States altogether due to unfavorable economics. According to Moody's Investor Services, Sun Life has since become "a non-core, runoff operation, with the decline of its US market presence given the termination of new business and the gradual runoff over time of its . . . institutional liabilities." http://www.moodys.com.

that Imperial was responsible for fraudulent misrepresentations in the Policies' applications and that the Policies were void *ab initio* because they allegedly lacked insurable interest.

85.     In furtherance of its scheme, on April 18, 2013, Sun Life filed a complaint against Imperial in this Court contesting the validity of the Policies and alleging that Imperial orchestrated an incredible fraudulent scheme designed to take ownership of the Policies.  *See Sun Life Assurance Company of Canada v. Imperial Holdings Inc. et al.,* No. 9:13-cv-80385 (DMM). In its complaint, Sun Life knowingly and falsely claims that each Policy lacks insurable interest and raises conclusory allegations of fraud and racketeering that are unsupported by any facts and that Sun Life included solely for their *in terrorem* effect.[14]

86.     Sun Life's meritless actions apparently have no limits.  To be sure, in its complaint Sun Life goes as far as to assert (quite frivolously and in violation of Fed. R. Civ. P. 11) that Imperial caused misrepresentations in applications for policies <u>that Sun Life knows were issued before Imperial was even created</u>.  For example, the Policy on the life of Lucy Eckstein was issued on April 17, 2006, and the Policy on the life of Jerry Baker was issued on April 12, 2006.[15] However, Imperial was not created until November 2006.

87.     While Sun Life contests the validity of the Policies and seeks to evade its obligation to pay the Policies' death benefits, it has also continued to demand the payment of millions of dollars in premiums for these same Policies.  Indeed, as recently as July 12, 2013, Sun Life mailed Imperial "lapse notices" for several of the Policies wherein Sun Life threatened to lapse the Policies if it does not receive over one million dollars in premium payments.[16]

---

[14]     Imperial filed a motion to dismiss Sun Life's Amended Complaint in the above-referenced action (Exhibit D), which is currently pending before the Court.

[15]     Similarly, Sun Life has misrepresented to this Court that Imperial has caused misrepresentations on applications for certain policies that Sun Life knows Imperial was not aware existed until years after the policies were issued (i.e., the Policies on the lives on Stephen Rogers and Carole Berg). Contrary to the misrepresentations made by Sun Life to the Court, Imperial never premium financed loans associated with these policies or had any involvement with them until years after they were in effect.

[16]     In particular, the lapse notices demand payment of $87,130.89 for the policy insuring Terry S. Graw; $78,411.00 for the policy insuring Gary Granby; $70,218.00 for the policy insuring Robert Good; $115,200.00 for the policy insuring Joan Korn; $61,770.00 for the policy insuring Dale Dickler; $10,876.40 for the policy insuring Diane Pastore; $77,107.00 for the policy insuring Donna Solk; $62,698.00 for the policy insuring Ronald Spohn; $62,765.08 for

88.     As a result of Sun Life's illegal and fraudulent conduct, the Policy Trust Owners and Imperial face a dilemma to either: (a) forfeit their rights to receive the death benefit by lapsing or surrendering the Policies, or (b) continue paying premiums to Sun Life that it intends to retain while seeking to evade its obligations to pay the death benefit.

89.     Sun Life's unconscionable and malicious actions—motivated by its desire to create excess profits—are being carried out in disregard of its duty to act in good faith in dealing with its policyholders, the insureds, and the public.

90.     Sun Life's actions have caused and continue to cause the Policy Trust Owners and Imperial grave damages, and have generated uncertainties and a *bona fide* controversy between Sun Life and the owners of the Policies, including Imperial.

91.     Sun Life is engaging in its scheme with absolute disregard for (i) the truth, (ii) the documented existence of insurable interest at issuance in each of the Policies, (iii) the applicable laws, and (iv) the fact that making a premium finance loan on a life insurance policy is a perfectly legitimate transaction that is sanctioned and regulated throughout the Nation.[17]

**K.  Damages and Assignment**

92.     Sun Life's illegal conduct and breach of duty has significantly diminished the value of the Policies, among other things. For instance, because Sun life has contested the

---

the policy insuring Stephen Rogers; $27,812.00 for the policy insuring Evelyn Mitchel; $6,836.55 for the policy insuring Sandra Berner; $121,439.00 for the policy insuring Martin Wasser; $129,774.00 for the policy insuring Kalman Talansky; $192,398.00 for the policy insuring Polya Blithstein; $28,998.00 for the policy insuring Sheila Bernstein. *See, e.g.,* Exhibit E (recent letters sent by Sun Life requiring the payment of premiums in connection with certain Policies, stating that "[t]he policy will lapse if a payment . . . is not received by [a certain date] . . . Unless such payment is received on or before the above date, the life insurance will terminate and there will be no further coverage under the policy.").

[17]     Sun Life's actions in contesting the validity of the Policies are not only fraudulent and factually insupportable, but are also illegal under state insurance anti-discrimination laws.  State anti-discrimination laws prohibit insurance carriers from discriminating between individuals of the same class and of equal expectation of life. *See, e.g.,* Fla. Stat. 626.9541(1)(e)1.  Thus, an insurer cannot deny coverage based solely on an insured's use of premium financing. *See, e.g.,* Cal. Ins. Code § 10113.2(i)(2) ("[T]he existence of premium financing may not be the sole criterion employed by an insurer in a decision whether to reject an application for life insurance.").  Here, however, Sun Life is doing precisely what these laws prohibit: notwithstanding that the Policies indisputably had insurable interest at inception, Sun Life is attempting to deny coverage or otherwise discriminate simply because the Policies were at some point in time subject to premium financing.

validity of the Policies, there is little interest in purchasing or financing them in the secondary market. In addition, Sun Life's actions have affected Imperial's ability to raise capital, to the detriment of Imperial and its shareholders.

93.     Although the exact extent of the damages suffered has not been calculated, it is estimated that such damages will exceed $30,000,000.00, exclusive of the punitive damages award that is also being requested in this Complaint.

94.     As stated previously, the Policy Trust Owners and Imperial have assigned to Imperial Finance all causes of actions they have against Sun Life.

## V.  CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### (Declaratory Judgment)

95.     Imperial re-alleges the preceding allegations as if fully set forth herein.

96.     An actual controversy has arisen and a real dispute exists with respect to the validity and enforceability of the Policies, whether the Policies lack insurable interest, and whether the statutory incontestability bars prevent Sun Life from contesting the validity of the Policies or raising any defense to avoid its obligations.

97.     Declaratory relief is appropriate pursuant to 28 U.S.C. § 2201(a) because these controversies concern the legal rights and obligations of the parties and the issues raised are sufficiently definite and concrete as to allow a conclusive judgment.

98.     Declaratory relief is necessary as Imperial will continue to suffer hardship if judicial consideration is withheld.  Among other injuries, Sun Life continues to bill Imperial or its assignees for premium payments on the Policies with no assurance that Sun Life will honor any of its obligations, pay the death benefit on the Policies, or even return the premiums collected on any Policy Sun Life does not eventually honor.

99.     Imperial Finance and/or its assignors therefore seek declarations regarding the following:

      a.     That all the Policies are valid and enforceable and Sun Life is obligated to honor all of its obligations under the Policies;

      b.     That there was an insurable interest at the inception of all the Policies because, among other things, from inception, the death benefit under the

Policies were ultimately payable to persons with insurable interest in the life of the insureds;

c.  That Sun Life is precluded under the applicable statutory incontestability clauses from contesting the validity of the Policies, raising any defense to avoid its obligations under the Policies, and pursuing the lawsuit it improperly filed against Imperial entities; and that notwithstanding the above

d.  Sun Life is estopped from contesting the validity of the Policies, in light of (i) the numerous representations Sun Life has made regarding the validity of the Policies, (ii) its continuous demand that the policy owners comply with their obligations under the Policies (including their obligation to pay Sun Life premiums), and/or (iii) Sun Life's promises and representations that it would not contest the validity of the Polices beyond the expiration of the applicable two-year contestability period if premiums are current.

100.  In the event that a judgment is entered finding any of the Policies void *ab initio*, Imperial and its assignors seek a judgment declaring that Sun Life is required to return to Imperial all premiums (plus interest) collected on each of the Policies adjudicated void *ab initio*.

## SECOND CAUSE OF ACTION
### (Breach of Contract)

101.  Imperial re-alleges the allegations contained in paragraphs 1 through 94 as if fully set forth herein.

102.  The Policies are enforceable contracts.

103.  All conditions under the Policies have been met by the policy owner of each of the Policies and all premiums currently owed under each of the Policies have been paid to Sun Life.

104.  Under the terms of the Policies, Sun Life agreed to the following, among other things:

a.  That the policy owner has "the sole and absolute power to exercise all rights and privileges under [the] Policy without the consent of any other person [including Sun Life]." *See, e.g.,* Exhibit A, at 16.

b.      That the policy owner has the right to "change the Owner and Beneficiary by written notice," which <u>must</u> take effect <u>immediately</u> upon Sun Life's "acknowledge[ment or] *receipt* of the notice." *Id.* (emphasis added).

c.      To mail to the policy owner a grace notice informing the policy owner of the amount due to keep the Policy in force if the Policy would lapse by reason of insufficient value. *Id.* at 22.

d.      To pay the death benefit upon the death of an insured where the Policy is beyond the two-year contestability period and premiums have been paid.

e.      Not to contest the Policy, except for non-payment of premiums, after each Policy's two-year contestability period has expired. *See, e.g., id.* at 14.

105.    Notwithstanding the above, Sun Life breached its promises and obligations under the Policies by doing the following, among other things:

a.      Obstructing and interfering with the policy owners' "sole and absolute power to exercise all rights and privileges" under the Policies.

b.      Refusing to honor changes of owners and beneficiaries for some of the Policies even though Sun Life received the required written notices.

c.      Refusing to mail grace notices and refusing to provide other information Sun Life is required to provide the policy owners of the Policies.

d.      Renouncing its contractual obligation to pay the death benefit under the Policies.

e.      Contesting the validity of the Policies even though the Policies are beyond the two-year contestability period and premiums are current.[18]

---

[18]     In a recent memorandum opinion, the Ninth Circuit Court of Appeals rejected allegations like Sun Life's, holding that where an insured forms an insurance trust to apply for and own a policy to insure his own life and the trust's beneficiary (his wife) has insurable interest, the irrevocable trust in turn has an insurable interest when the policy is issued. *Wells Fargo Bank, N.A. v. American National Insurance Company,* 493 F. App'x 838 (9th Cir. 2012). The court added that this complied with the insurable interest statute and <u>it mattered not whether the policy was eventually transferred or whether there was an intent to transfer the policy in the future</u>. As explained by the court, "[a]n intent to transfer 'does not negate the fact that when the trust acquired the policies, they were supported by an insurable interest,' and therefore . . . it made no difference that the [insured and his wife] always intended to transfer" the beneficial interest in the trust." *Id.*

106.    As a direct and proximate result of Sun Life's breach of its obligations under the Policies, Imperial Finance and/or its assignors have been damaged in an amount that is estimated to exceed $30,000,000.00, all of which was foreseeable by Sun Life and all of which Plaintiff is entitled to collect from Sun Life.

**THIRD CAUSE OF ACTION**
**(Breach of the Covenant of Good Faith and Fair Dealing)**

107.    Imperial re-alleges the allegations contained in paragraphs 1 through 94 and 102 through 106 as if fully set forth herein.

108.    Sun Life has breached the covenant of good faith and fair dealing that is implicit in all the Policies by, among other things, imposing additional extra-contractual requirements as conditions to fulfilling its obligations under the Policies.  *See, e.g.*, *Schwartz v. Liberty Mut. Ins. Co.,* 539 F.3d 135, 141 (2d Cir. 2008) (under California law, "[a]n insurer owes to its insured an implied-in-law duty of good faith and fair dealing that it will do nothing to deprive the insured of the benefits of the policy").  For example, while each Policy requires Sun Life to record a change of ownership and beneficiary upon "acknowledge[ment or] receipt" of  a notice, Sun Life has refused to do so unless the policy owners produce certain information to it and comply with extra-contractual conditions unilaterally imposed by Sun Life.

109.    Sun Life has also violated the covenant of good faith and fair dealing that is implicit in all the Policies by filing its frivolous and malicious complaint.

110.    As a direct result of Sun Life's conduct, Imperial Finance and/or its assignors have been damaged and injured, and are thus entitled to recover all losses suffered, in an amount to be determined at trial.

**FOURTH CAUSE OF ACTION**
**(Fraud)**

111.    Imperial re-alleges the allegations contained in paragraphs 1 through 94 as if fully set forth herein.

---

Similarly, in 2010, a state court in Florida issued an order granting summary judgment against Sun Life in a case where Sun Life was also arguing the invalidity *ab initio* of a policy issued in Georgia based on lack of insurable interest. In its complaint, Sun Life similarly alleged a so-called scheme involving the use of premium finance, but the court flatly rejected Sun Life's argument, finding that the policy at issue did not lack insurable interest because when the policy was issued, the beneficiary of the trust that owned the policy was the insured's husband (*i.e.,* a person with insurable interest). *See* Exhibit F (copy of summary judgment order).

112.    With the specific intent to deceive, Sun Life has knowingly and intentionally made numerous material misrepresentations and omissions of fact to the Policy Trust Owners and Imperial in, among other things, the Policies, premium notices, annual policy statements, policy illustrations, and verifications of coverage.  Among other things, Sun Life has knowingly misrepresented (i) that it considers the Policies to be in force, (ii) it considers the Policies to be active, (iii) it considers the Policies to be valid, and (iv) it will not contest the Policies beyond the two-year contestability period except for non-payment of premiums.

113.    For example, Sun Life has made each of the representations mentioned in Exhibit G (each of which is incorporated herein by reference) and the following representation made in the Policies: "After this Policy has been in force during the lifetime of the Insured for a period of two years from its Issue Date, we [Sun Life] cannot contest it except for non-payment of Premiums."

114.    However, at the time that Sun Life made each of the statements mentioned in this Count, Sun Life knew that the statements were false and Sun Life made each of the statements to induce the policy owners to make premium payments to Sun Life or arrange for someone else to make premium payments to Sun Life.

115.    At all relevant times, Sun Life merely intended to create the illusion of the existence of valid life insurance policies (with the specific terms contained in the Policies) to induce the Policy Trust Owners and Imperial to continue to pay premiums that Sun Life intended to collect as excess profits and has been scheming to forever keep.

116.    To be sure, when making its representations mentioned in this cause of action, Sun Life hid from the policy owners, insureds, lenders, Imperial and others that it intended to contest the validity of every policy that was, among other things: (i) financed by Imperial, (ii) purchased by Imperial, (iii) transferred by the original owner to a third party that would be unlikely to allow the policy to lapse, (iv) purchased for the purpose of being sold even though there is an insurable interest at issuance under the applicable state statutes, (v) purchased for the purpose of being used as collateral even though there is an insurable interest at issuance and there is no specific intent to sell the policy to any third party, or (vi) premium financed.

117.    The Policy Trust Owners justifiably relied on Sun Life's representations in, among other things, obtaining life insurance, and Imperial justifiably relied on the same and other Sun Life representations in, among other things, deciding to provide premium financing.

118.   The Policy Trust Owners and Imperial also justifiably relied on Sun Life's representations of fact to, among other things, pay Sun Life millions of dollars in premiums that they would not have paid had it not been for Sun Life's misrepresentations.

119.   As a direct and proximate result of Sun Life's conduct, fraudulent misrepresentations, and omissions, Imperial Finance and/or its assignors have been damaged in an amount to be proven at trial, which amount Plaintiff moves to recover from Sun Life.

## FIFTH CAUSE OF ACTION
### (Promissory Estoppel)

120.   Imperial re-alleges the allegations contained in paragraphs 1 through 94 as if fully set forth herein.

121.   This count for promissory estoppel is pleaded in the alternative to the claim for breach of contract.

122.   Sun Life made numerous representations of material fact to the Policy Trust Owners and Imperial in, among other things, the Policies, premium notices, annual policy statements, policy illustrations, and verifications of coverage.  Among other things, Sun Life represented that if the Policy Trust Owners and/or Imperial made timely premium payments, Sun Life would (i) consider the Policies to be in force, (ii) consider the Policies to be active, (iii) consider the Policies to be valid, and (iv) not contest the Policies beyond the two-year contestability period except for non-payment of premiums.

123.   For example, Sun Life has made each of the representations mentioned in Exhibit G (each of which is incorporated herein by reference) and the following representation made in the Policies: "After this Policy has been in force during the lifetime of the Insured for a period of two years from its Issue Date, we [Sun Life] cannot contest it except for non-payment of Premiums."

124.   To their detriment, the Policy Trust Owners relied on Sun Life's representations in obtaining life insurance, and Imperial relied on the same and other Sun Life representations in deciding to provide premium financing.  The Policy Trust Owners and Imperial also relied, to their detriment, on Sun Life's representations of fact when paying Sun Life millions of dollars in premiums that they would not have paid had it not been for Sun Life's misrepresentations.

125.    As a direct result of Sun Life's conduct, Imperial Finance and/or its assignors have been damaged and injured, and are thus entitled to recover all losses suffered, in an amount to be determined at trial.

## PRAYER FOR RELIEF

Wherefore, Imperial respectfully prays for judgment against Sun Life as follows:

1.    For the declarations specified in the First Cause of Action herein;

2.    For general and compensatory damages according to proof;

3.    For punitive and exemplary damages according to proof;

4.    For prejudgment interest in an amount to be proved at time of trial;

5.    For costs of suit incurred herein; and

6.    For such further and additional relief as the Court deems appropriate under the circumstances, including attorneys' fees, as may be proper.

## JURY TRIAL DEMANDED

Dated:  July 29, 2013                          Respectfully submitted,


By: */s/ George E. Schulz, Jr.*
George E. Schulz, Jr.
Florida Bar No. 169507
Email:  buddy.schulz@hklaw.com
HOLLAND & KNIGHT LLP
50 North Laura Street, Suite 3900
Jacksonville, Florida  32202
Telephone: (904) 358-2000
Facsimile: (904) 358-1872

/s/ Jesus E. Cuza
Florida Bar No. 428991
Email: jesus.cuza@hklaw.com
/s/ J. Raul Cosio
Florida Bar No. 503630
Email: raul.cosio@hklaw.com
/s/ Ina M. Berlingeri
Florida Bar No. 33482
Email: ina.berlingeri@hklaw.com
/s/ Monica Vila
Florida Bar No. 22976
Email: monica.vila@hklaw.com
/s/ Rebecca J. Canamero

Florida Bar No. 86424
Email: rebecca.canamero@hklaw.com
HOLLAND & KNIGHT LLP
701 Brickell Avenue, Suite 3000
Miami, Florida  33131
Telephone:                    (305) 374-8500
Facsimile:                    (305) 789-7799

*Attorneys for Plaintiff*